Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Blanche M. Manning | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 03 CR 198 | **DATE** | October 1, 2003 |
| **CASE TITLE** | *United States v. Locke* | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] For the reasons set forth in the attached Memorandum and Order, For the foregoing reasons, Defendant Locke's Motion for Downward Departure is GRANTED. It is so ordered.

(11) ☐ [For further detail see order on the reverse side of the original minute order.]

| | No notices required, advised in open court. | | | | |
|---|---|---|---|---|---|
| | No notices required. | | | number of notices | Document Number |
| ✓ | Notices mailed by judge's staff. | | | OCT 2 - 2003 date docketed | |
| | Notified counsel by telephone. | | | | |
| | Docketing to mail notices. | | | | 29 |
| | Mail AO 450 form. | | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | | |
| RTS | courtroom deputy's initials | | | date mailed notice | |
| | | Date/time received in central Clerk's Office | | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DOCKETED
OCT 2 - 2003

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| | ) Hon. Blanche M. Manning |
| v. | ) |
| | ) 03 CR 198-1 |
| ANN MARIE LOCKE, | ) |

## MEMORANDUM AND ORDER

Defendant Ann Marie Locke pled guilty to one count of bank fraud, in violation of 18 U.S.C. §§ 1344 and 2. The present matter comes before this Court on sentencing and Locke's Motion for Downward Departure. For the reasons set forth herein, the motion is GRANTED.

### BACKGROUND[1]

Locke was employed by LaSalle Bank ("the Bank") as a senior commercial loan associate. Her responsibilities included reconciling the Bank's general ledger account. On June 7, 2000, Locke transferred $120,000 from the general ledger account into a dormant business account and then transferred the money into a checking account at Bank One belonging to Gena Wade. To transfer the money out of the general ledger account, Locke forged her supervisor's signature. Prior to transferring the money to Wade's account, Locke approached Wade with a plan to defraud the Bank. According to the PSR, Locke approached Wade because she knew that she was having financial difficulties.

After the money was transferred into Wade's account, Wade and Locke divided the ill-gotten money between themselves – Locke receiving $63,500 and Wade $56,500. Locke then

---

[1] The facts in the Background section and throughout this opinion are taken from the Presentence Investigation Report ("PSR") which was prepared by the United States Probation Office ("Probation") and the parties' submissions.

used the money for a down payment on a home for her and her son, to pay off personal debts and expenses, and to pay for college at DePaul University.

Not long after the theft, the Bank informed Locke that her supervisor would audit the accounts for which she was responsible. The audit was scheduled for October 25, 2000. Instead of showing up for work on the twenty-fifth, however, Locke simply quit her job, her last day being October 24, 2000.

Shortly afterwards, the Bank discovered the missing money and contacted the FBI. When questioned by the FBI, Locke admitted her guilt. According to Locke, she transferred the money out of the account she was responsible for because: (1) there were excess funds in the account which were unaccounted for, and she feared that she would lose her job; and (2) she had excessive personal debts and expenses. Subsequently, Locke pled guilty to bank fraud and is now awaiting sentencing by this Court.

Under the United States Sentencing Guidelines ("the Guidelines"), Locke's total offense level is a 13, based on a base offense level of 6 (section 2B1.1), plus 8 levels for the amount of loss (between $70,000 and $120,000) (section 2B1.1(b)(1)(E), plus 2 levels for abuse of a position of trust (section 3B1.1), minus 3 levels for acceptance of responsibility and notifying the Government in a timely manner. Locke now seeks a downward departure.

**ANALYSIS**

Generally, the sentencing court must impose a sentence falling within the applicable range set forth in the Guidelines. See Koon v. United States, 518 U.S. 81, 85 (1996). The court may, however, depart from the Guideline sentence if it "finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described." 18 U.S.C. § 3553(b). See also U.S.S.G. § 5K2.0; Koon, 518 U.S. at 92. Therefore, "[i]n the absence of a characteristic or circumstance that distinguishes a case as sufficiently atypical to warrant a sentence different from that called for under the guidelines, a sentence outside the guideline range is not authorized." U.S.S.G. § 5K2.0, Comment.

Examining departures from the Guidelines, the Supreme Court in Koon explained that the Sentencing Commission intended "the sentencing courts to treat each guideline as carving out a 'heartland', a set of typical cases embodying the conduct that each guideline describes." Koon, 518 U.S. at 93 (quoting U.S.S.G. ch. 1, pt. A, intro. cmt. 4(b)). The Sentencing Commission, however, "did not adequately take into account cases that are, for one reason or another, unusual." Id. Thus, "[w]hen a court finds an atypical case, one to which a particular guideline linguistically applies but where conduct significantly differs from the norm, the court may consider whether a departure is warranted." U.S.S.G. ch. 1, pt. A, intro. cmt. 4(b). Therefore, before a sentencing court is permitted to depart from the Guidelines, the court must find that the case is "unusual" enough for it to fall outside the "heartland" of cases covered in the applicable guideline. See Koon, 518 U.S. at 93.

The Court in Koon set forth the following factors that sentencing courts should use in determining whether a departure from the applicable guidelines range is appropriate:

1) What features of this case, potentially, take it outside the Guidelines' "heartland" and make of it a special, or unusual, case?
2) Has the Commission forbidden departures based on those features?
3) If not, has the Commission encouraged departures based on those features?
4) If not, has the Commission discouraged departures based on those features?

Koon, 518 U.S. at 95. The Court went on to explain the mechanics of applying this framework:

If the special factor is a forbidden factor, the sentencing court cannot use it as a basis for departure. If the special factor is an encouraged factor, the court is authorized to depart if the applicable Guideline does not already take it into account. If the special factor is a discouraged factor, or an encouraged factor already taken into account by the applicable Guideline, the court should depart only if the factor is present to an exceptional degree or in some other way makes the case different from the ordinary case where the factor is present. If a factor is unmentioned in the Guidelines, the court must, after considering the structure and theory of both relevant individual guidelines and the Guidelines taken as a whole, decide whether it is sufficient to take the case out of the Guidelines heartland. The court must bear in mind the Commission's expectation that departures based on grounds not mentioned in the Guidelines will be highly infrequent.

Id. at 95-96 (citations and internal quotations omitted). The Guidelines seek to "aid the court by identifying some of the factors that the Commission has not been able to take into account fully in formulating the guidelines." U.S.S.G. § 5K2.0. These factors are listed in sections 5K2.1 to 5K2.17.

Here, Locke now seeks a departure on the following grounds: (I) the fraud was an act of aberrant behavior; (II) extraordinary family circumstances exist; (III) she suffered from diminished capacity when committing the crime; and (IV) she has made great strides in her post-offense rehabilitation.[2] The Court will address each of these contentions in turn.

---

[2] Locke also contends that the combination of the above factors together are sufficient grounds for a downward departure.

-4-

## I. Aberrant Behavior

Guideline section 5K2.20 states that a court "may" sentence a defendant below the "range . . . warranted" if the "criminal conduct constituted aberrant behavior." Application Note 1 defines "aberrant behavior" as "a single criminal occurrence or single criminal transaction that (A) was committed without significant planning; (B) was of limited duration; and (C) represents a marked deviation by the defendant from an otherwise law-abiding life."

When determining whether a criminal act constitutes aberrant behavior, "the court may consider the defendant's (A) mental and emotional conditions; (B) employment record; (C) record of prior good works; (D) motivation for committing the offense; and (E) efforts to mitigate the effects of the offense." Guideline section 5K2.20, Application Note 2.

Under the Seventh Circuit's interpretation of section 5K2.20, to qualify as aberrant behavior the criminal conduct must constitute "a spontaneous and seemingly thoughtless act rather than one which was the result of substantial planning because an act which occurs suddenly and is not the result of a continued reflective process is one for which the defendant may not be arguably accountable." United States v. Carey, 895 F.2d 318, 324-25 (7th Cir. 1990). The act "must be more than merely something out of character," it must be a "sudden or unplanned act." United States v. Bradely, 196 F.3d 762, 771 (7th Cir. 1999).

In Carey, 895 F.2d at 324-25, in reversing the district court's downward departure, the Seventh Circuit noted that the facts in United States v. Russell, 870 F.2d 18 (1st Cir. 1989), "provide an excellent example of the type of behavior that a court may properly consider a single act of aberrant behavior." In Russell, an armored car driver, who had no previous criminal record, was mistakenly handed an extra bag of money containing $80,000. Id. at 20. Although

the defendant initially kept the money, he admitted to the theft a week later and all the money was returned. Id. The Seventh Circuit noted that the criminal acts in Russell come very close to being a single act of aberrant behavior because the defendant "was apparently overcome by the sudden intoxication of unexpected and immediate wealth" and "committed only one act and returned the money soon after committing the offense." Carey, 895 F.2d at 324-25.

Here, Locke contends that a 2001 amendment to the Guidelines, abrogated the Seventh Circuit's rule that the criminal conduct had to be "spontaneous." While this Court is not sure that this is a correct interpretation of the law, it is unnecessary to determine this legal issue because under the current Guidelines, this Court cannot find that Locke's theft of the $120,000 was committed without significant planning. Locke's theft, while not the crime of the century, entailed a good deal of planning. To steal the money, Locke, who was responsible for the bank's general ledger, took the following acts: (1) she recruited Co-Defendant Wade, whom she knew was having financial difficulties and thus would likely participate in the crime, so that she would have an account into which to transfer the ill-gotten funds; (2) she forged her supervisor's signature; (3) transferred the money into an inactive account and then into Wade's personal account; and (4) instructed Wade to withdraw the money so that they could split the proceeds. Indeed, this Court finds that this crime entailed equal or greater planning than the typical insider bank fraud scheme. Accordingly, this Court finds that Locke's theft was not a single act of aberrant behavior.

## II. Extraordinary Family Circumstances

Courts may grant a downward departure for "extraordinary family circumstances" where the defendant's children or other family members are unusually dependent upon the defendant and could face serious mental or physical problems if separated from the defendant. See United States v. Stefonek, 179 F.3d 1030, 1038 (7th Cir. 1999) (reconsideration of departure based on extraordinary family circumstances was warranted where defendant was a single mother of a 12-year old with learning problems; such reconsideration required a determination of whether child would suffer greater harm than normal child, what care would be available for child while defendant was in prison and whether professional assistance was available for the child); United States v. Owens, 145 F.3d 923, 929 (7th Cir. 1998) (affirming downward departure from imprisonment range of 168-210 months and imposing a sentence of 120 months in crack cocaine possession case; the defendant was primary support for wife and children; family would go on public assistance as a result of defendant's incarceration; defendant spent time every day with brother who suffered from Downs Syndrome); United States v. Gauvin, 173 F.3d 798, 806-08 (10th Cir. 1999) (14-month departure in case involving assault on federal officer with a dangerous weapon; the defendant was a father and supporter of his wife and four young children; wife could barely support family, and she was in danger of losing custody of the children); United States v. Galante, 111 F.3d 1029, 1035-36 (2nd Cir. 1997) (approving 13-level downward departure in a drug case to time served plus 24 months home detention for a defendant with two young children ages eight and nine; wife and children were uniquely dependent on the defendant because the wife was unable to speak English and could not support the family); United States v. Sclamo, 997 F.2d 970, 973-74 (1st Cir. 1993) (affirming a downward departure where the

defendant had developed a special relationship with the young son of a woman with whom he was living who had psychological and behavioral problems, and his psychologist believed there would be a risk of "regression and harm if [the] defendant were incarcerated").

Additionally, many commentators agree that "family responsibility" departures are consistent with, and not contrary to, the Guidelines. See, e.g., Jack B. Weinstein, The Effect of Sentencing on Women, Men, the Family, and the Community, 5 Colum. J. Gender & L. 169, 178 (1996) ("[i]n certain cases, in view of the necessity of maintaining family stability in environments where father role models are few and far between, downward departures from the Guidelines and a search for alternatives to incarceration are a necessity for male defendants"); Jody L. King, Avoiding Gender Bias in Downward Departures for Family Responsibilities Under the Federal Sentencing Guidelines, 1996 Ann. Surv. Am. L. 273, 301 (1996) (suggesting that increased use of departures for family responsibilities is appropriate, but cautioning that "the decision to grant a downward departure for family responsibilities [should] turn[ ] on the need of the defendant's dependents"); Placido G. Gomez, The Struggle Against Unwarranted Uniformity: The Evolution of Federal Sentencing Departures Based on Extraordinary Family Circumstances--The Case of Low-Level Drug Offenders, 21 J. Marshall L. Rev. 77, 90 (1995) (suggesting the use of alternative to incarceration in cases involving low-level drug offenders with extraordinary family responsibilities).

Applying the above principals, Judge Williams, in United States v. Graham, 1998 WL 88885, at * 3-4 (N.D. Ill. Feb. 20, 1998), granted a downward departure based on extraordinary family ties and responsibilities. The defendant in Graham pled guilty to four counts of bank robbery. Id. at *1. Before committing the robberies, the defendant's business was "completely

wiped out," and as a result, the defendant was unable to pay for nursing care for his seriously ill wife and began caring for her at their home. Id. After the death of his wife, the defendant suffered a nervous breakdown that led to his drinking heavily and the commission of the bank robberies. Id. Since being arrested, however, the court found that the defendant "has been sober, completely cooperative, and openly remorseful." Id. at 3.

Reviewing decisions where family circumstances were found to be extraordinary, Judge Williams noted that "other courts faced with this question have departed downwards when the defendant was solely responsible for the physical and mental health of a family member." Id. at *4. Reviewing the defendant's circumstances, the court found that the defendant's daughter-in-law and her family had become "very dependent on [the] defendant." Id. at *5. The defendant lived with his son and his wife, who is disabled, and their two children. Id. The defendant cooks, cleans, cares for the daughter-in-law, and generally manages the home. Id. Consequently, Judge Williams found that:

> in light of the tragic circumstances leading up to defendant's involvement in the charged offense and defendant's confession upon his arrest, the court finds that no end will be served by imprisoning defendant for the time prescribed by the guidelines. Based on the factors detailed above and the fact defendant is currently 70 years old, currently sober, and no longer depressed, the court finds that defendant is no longer a threat to the community. Accordingly, the court concludes that [defendant's] family ties and responsibilities take his case outside the Guidelines' heartland and warrant a downward departure.

Id. at *5.[3]

---

[3] The Court notes that in at least two other similar cases, Judge Williams granted a downward departure where she found that the defendant was the primary financial provider for his children, United States v. Strong, 1996 WL 745397 (N.D. Ill. Dec. 23, 1996), and where the incarceration of the defendant would endanger his children's physical and/or mental health. United States v. Jones, 1999 WL 1144910 (N.D. Ill. Dec. 8, 1999).

Here, Locke has an eight year-old son (Kendall), who has severe emotional problems and a learning disability. Although only eight years old, Kendall has entertained thoughts of suicide and made suicidal gestures. A social worker, who evaluated Kendall, testified that Kendall has "significant attachment issues and fear of abandonment" and "if separated from his mother for any significant period of time, it would place him in crisis and raise concerns for his safety." According to the social worker, who has extensive experience working with troubled children in the inner city, Kendall's "attachments with his mother are at an extreme level because of the lack and loss that he has had with "significant adult figures" in his life. There is a strong fear [] that if he lost [his mother], there would be some serious repercussions for him emotionally and . . . behaviorally." The social worker further testified that, even though Kendall could be adequately cared for by Locke's parents, Kendall would face a "severe emotion crisis" and could be a danger to himself and others if separated from his mother for any period of time.

Accordingly, this Court finds that Kendall's unique mental state and extreme attachment to his mother make this an "extraordinary" case which takes it outside the "heartland" of the normal case where a parent is sent to prison.

### III. Diminished Mental Capacity

Section 5K2.13 allows a court to depart below the Guidelines if "the defendant committed the offense while suffering from a significantly reduced mental capacity." "Significantly reduced mental capacity means that the defendant although convicted has a significantly impaired ability to (A) understand the wrongfulness of the behavior compromising the offense or to exercise the power of reason; or (B) control behavior that the defendant knows is wrongful." Guideline section 5K2.13, Comment 1. Additionally, the defendant must show

-10-

that there is at least "some causal connection between [her] mental condition and [her] criminal conduct." United States v. Dyer, 216 F.3d 568, 571 (7th Cir. 2000).

Here, a psychiatrist, who testified on Locke's behalf, concluded that Locke was suffering from an "emotional condition that . . . was severe enough so as to significantly impair her ability to understand the wrongfulness of her behavior." The Government contends that this opinion is unreliable because it is based solely on unconfirmed information presented by Locke at two one hour sessions with the doctor.

After carefully examining the doctor's report and testimony, this Court finds that even assuming the doctor's opinion to be sound, a diminished capacity departure is not appropriate in this case. Regardless of the extent of Locke's mental problems, the Court is unconvinced that her mental capacity was reduced to such an extent that she was unable to understand the wrongfulness of her actions or control her behavior, as required by section 5K2.13. For example, as explained above, Locke's actions before and after the crime show extensive planning and consciousness of her actions. Moreover, when it became apparent that the Bank would discover her theft, she simply quit her job and when questioned by the Bank and the FBI, she told them that she committed the crime because "she felt no one in her department would ever be able to balance the general ledger and figured no one would miss the funds since there was over 4 million in the account."

## IV. Post-Offense/Pre-Sentencing Rehabilitation

As for post-arrest/pre-sentencing rehabilitation, although the Seventh Circuit has not ruled on the issue, at least one circuit has suggested that extraordinary post-offense rehabilitation can support a downward departure. See United States v. Harrinton, 947 F.2d 9567, 962 (D.C.

Cir. 1991) (R. Ginsberg, J.). Here, other than the fact that Locke assisted the Government in getting some of the stolen money back and has paid $500 in restitution towards the money (over $95,000) which was not recovered, it does not appear that there is anything "extraordinary" about her post-offense/pre-sentencing rehabilitation.

## CONCLUSION

For the foregoing reasons, Defendant Locke's Motion for Downward Departure is GRANTED. It is so ordered.

**ENTER:**

*Blanche M. Manning*
**BLANCHE M. MANNING**
**U.S. DISTRICT COURT JUDGE**

**DATE:** 10-1-03